**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 18-CR-565-3 CDP/JMB |
| ) | |
| CHRISTOPHER NICHOLAS PIPES, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

Comes now Defendant Christopher Pipes, by his attorney, John D. Stobbs II, and for his Motion to Suppress Statements states:

*I. Facts*

The undersigned expects the Government will introduce into evidence at the Hearing on this Motion, copies of the videotaped interviews that took place between Defendant and law enforcement. Because the interviews of Defendant were recorded, there is no need to give a blow by blow description of what transpired.

It is important to point out though that there were two interview sessions. Agents Mike Betz and Tom Strode conducted the first interview which was halted because Defendant feared other co-Defendants in the building could hear him speaking to law enforcement. Defendant was transported to another room where the second interview was conducted by agents Tom Strode and Andy Frank.

While preparing this Motion, the undersigned met with Defendant on October 29, 2019. Defendant reiterated that prior to the interviews commencing and the recording device being turned on, he requested an attorney and indicated to law enforcement that he did not want to speak with law enforcement whatsoever without an attorney being present. As such, this is a basis to suppress statements he made.

Throughout both interviews Defendant was wearing only shorts. He was never provided a shirt until the interviews concluded. During the first 30 seconds of the first interview Defendant tells Betz and Strode "You know, I care about this, but can, you know, my hands in my pants and shit like that, but it's cold. Can I at least get a shirt or something?" On October 29, 2019 Defendant stated he was "cold as fuck" and was unable to "focus" while being questioned which might go to his voluntariness.

## II. Issues

The issues for this Honorable Court to decide is the veracity of the statements made as well as the voluntariness of the statements.

The first issue, of course, is Defendant's claim that he before any recording commenced he demanded an attorney. Like Defendant's claim that he felt "coerced" due to being placed in a cold room without a shirt can be dealt with through testimony of the interviewing agents.

Shortly after having his Miranda Rights read[1], Officer Betz insinuated that there was a recording of Defendant discussing the overdose death of an individual. Defendant asked Betz, "I was talking about somebody's death?" to which Betz responded "[Y]ou were talking about a lot of stuff." Defendant asked "can I hear?" Betz told Defendant "You can hear some of it. Do you want to talk about this?" As soon as Defendant told Betz "[N]o. Let me hear it," Defendant was threatened with life imprisonment as witnessed by the following colloquy between Officer Betz and Defendant:

> "Betz: Okay. And you understand that just so you're aware is this is the best opportunity you have to make a deal, right? Or to help yourself out and not to make a deal, to help yourself out, this is the time. You are facing, with your priors, you are facing life in prison, life in federal prison. I'm not lying to you. That was the DEA USA only.
>
> Pipes: Life?

---

[1] Prior to each interview commencing, law enforcement read Defendant his Miranda warnings and Defendant signed each warning. During the 2nd interview Officer Strode can be seen taking notes on the back of the Miranda warning Defendant signed. This piece of evidence was destroyed by Officer Strode. The reason given is because the interview was recorded and as such he felt he could destroy his notes even though they appear to have been taken on the back of a Miranda form which is to be disclosed pursuant to the Government's *Brady* obligations. This is not an issue for this Honorable Court, but will be an issue at trial.

Betz: Life in prison, life in federal prison. Yes."[2]

Throughout the second interview, the issue of Defendant receiving life remained a constant theme.  Almost immediately after having his Miranda rights read to him a second time, Defendant blurted out "I'm not trying to get released. I'm trying not to get no motherfucking life."  Officer Strode responded,

> "Yeah. Right. Right. I mean, I know you got young kids and that's the last thing that you want. You start talking about what was going on. Who were you guys getting your dope from? Here's Marissa with the key."

Just prior to Defendant making incriminating statements the following colloquy took place:

> "Strode:  Here, I couldn't tell you exactly. That's really something that would be discussed with the attorneys, but from the conversations that we've had with the attorneys that are handling this case, basically, for instance, with your priors and you're on federal parole right now, with what you've been charged with mandatory life, but all that stuff is negotiable depending on your cooperation. Does that make sense?
>
> Frank:  Basically the prosecutor decides... We can talk to them if you say, help us out, decide to help us out. We can tell them, "Hey, this guy gave us information. It helped out with this case, this case, this case. Look, we solved a murder, whatever" from five years ago or whatever. Since the prosecutor has so much ability to decide what to do, they listen to us, listen to what we say. Say, "This guy helped out. Fuck it I'm not going to charge him with this one or that one or it could less here or less there." They'll help you out. Basically, you're at this level right now. If you help us out, things canchange.
>
> Pipes: Right now I'm looking at life, for real."

It is Defendant's position that the foregoing constitutes a threat by law enforcement that if Defendant did not make incriminating statements he would be charged with mandatory life.  As such, the statements were not made voluntarily and their overall veracity should be questioned.

---

[2] As this Honorable Court is aware, the law changed subsequent to Officer Betz making this statement.  At the time this statement was made, Officer Betz was correctly stating the law.  Defendant is not alleging that Officer Betz knowingly, intentionally or even accidentally misstated the law.

### III. Law

It is well established that "[w]hen the government obtains incriminating statements through acts, threats, or promises which cause the Defendant's will to be overborne, it violates the Defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006), *quoting United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002). The Fifth Amendment rights involved are due process and the right to remain silent, and are offended where a Defendant's confession is involuntary. *See generally Id.* "The determination of voluntariness is based upon the totality of the circumstances." *Id.* This test considers "both the characteristics of the accused and the details of the interrogation … [including]: … (1) the age, intelligence, and education of the Defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the Defendant was advised of his constitutional rights; and (5) whether the Defendant was subject to physical punishment." *Lopez*, 437 F.3d at 1063-64, *citing Toles*, 297 F.3d at 965-966; *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). It is important to note that under this totality of the circumstances test, "[n]o single factor is determinative." *Lopez, 437 F.3d at 1063, citing United States v. Lugo*, 170 F.3d 966, 1004 (10th Cir. 1999). Moreover, "[t]he Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary." *Lopez*, 437 F.3d at 1063, *citing Missouri v. Seibert*, 542 U.S. 600, 608 n. 1 (2004).

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination*." Simmons v. Bowersox, 235 F. 3d, 1124, 1132 (8th Cir.) cert. denied,534 U.S. 924 (2001)* Whether a confession is involuntary is judged by the totality of the circumstances. *See Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir. 2001).* The reviewing Court must look at the "conduct of the officers and the characteristics of the accused." *See id.* The Government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were

4

voluntary. *See United States v. Astello*, 241 F.3d 965, 966 (8th Cir.), cert. denied, 533 U.S. 962, 121 S.CT. 2621, 150 L.Ed2d 774 (2001).

From the outset, it should be noted that Defendant was not subjected to any form of physical intimidation.  Moreover, there is nothing about the length of either his detention, or the present interrogation, that is particularly troublesome.  The defense's position rests primarily on the nature of the interrogation, most notably discussions concerning Defendant's opportunity to benefit from providing an incriminating statement and his failure to do so resulting in mandatory life imprisonment.  It is well established that "[u]nder Supreme Court … precedent, a promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced."  *Lopez*, 437 F.3d at 1064, *citing Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997).  As explained thoroughly above, Law Enforcement made numerous remarks conveying the opportunity for lenient treatment.  They directly informed Defendant that he was facing mandatory life imprisonment and that he possessed the power to choose between life imprisonment and a lesser sentence if he cooperated.  The message sent by Law Enforcement to Defendant was crystal clear.  In the event Defendant provided an acceptable confession, he would be treated better.

*United States v. Lopez*, 351 F.3d 254 (10th Cir. 2003), which involves facts similar to those presented here, is instructive.  Defendant Lopez was suspected of the shooting death of Dalton Box on an Indian reservation.  *Lopez*, 437 F.3d at 1060-61.  Officers apprehended Lopez the same day that the murder occurred, and began questioning him within an hour of his arrest.  *Id*.  Following the reading of *Miranda* rights, Lopez denied any involvement in Box's killing.  *Lopez*, 437 F.3d at 1061.  Questioning halted temporarily, as the arresting officers interviewed other witnesses. *Id*.  Several hours later, a second interview commenced.  *Id*.  Again, officers read Lopez his *Miranda* rights, after which he reiterated his innocence.  *Id*.  At this point, law enforcement confronted Lopez with false evidence.  *Id*.  For instance, Lopez was told that he failed a gunshot residue test, and that his footprints were found at the murder scene.  *Id*.  These assertions were

5

untrue.  *Id*.  Also, Lopez was told by officers that six eyewitnesses identified him as the shooter, when in reality there were only two.  *Id*.  In addition to these misrepresentations, Lopez was told that his mother, who provided an alibi, would be made to look a liar when testifying.  *Id*.  Thereafter, one of the officers wrote the words "mistake" and "murder" on two pieces of paper, and then wrote the numbers six and sixty on two different pieces of paper.  *Id.*  Lopez was asked to make choices concerning his fate, and told "if you cooperate, you know, … you could be looking at six years.  And if you don't cooperate and give us answers, you could be looking at 60 years."  *Id*.  Finally, Lopez was told about a murder case in which cooperating suspects received less time than non-cooperating suspects.  *Id.*  According to the officer, the cooperating suspects were "treated leniently" because the murder was a mistake.  *Id*.  A little over an hour into Lopez' interrogation, he confessed.  *Lopez*, 437 F.3d at 1061-62.  The Government thereafter indicted Lopez for murder.  *Lopez*, 437 F.3d at 1062.  After he successfully moved to suppress his confession, the Government appealed.  *Id*.

The United States Court of Appeals for the Tenth Circuit affirmed.  *Lopez*, 437 F.3d 1059.  It relied primarily on the interrogating officer's suggestion that Lopez might receive a six year sentence, as opposed to a sixty year sentence, if he admitted to shooting Box by mistake.  *Lopez*, 437 F.3d at 1064.  The Tenth Circuit noted that an officer can permissibly promise to make a defendant's cooperation known to the prosecution.  *Lopez*, 437 F.3d at 1064-65.  However, offers for favorable treatment that go beyond this type of "limited assurance", as in Lopez' case, can "critically impair a defendant's capacity for self-determination."  *Lopez*, 437 F.3d at 1065.

In addition to the suggestions of leniency that tainted Lopez's interrogation, the Tenth Circuit relied on law enforcement's misrepresentations and exaggerations concerning the evidence it had against Lopez.  *Id*.  The court recognized an officer's ability to employ deception relating to the strength of its case against a suspect.  *Id*., *citing Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997).  It held, however, that the "misrepresentation of the evidence against Lopez, together with [the officer's] promise of leniency to Lopez if he confessed to killing Box by mistake, are sufficient circumstances

6

that would overbear Lopez's will and make his confession involuntary." *Lopez*, 437 F.3d at 1065.

Here, like the comments made by Lopez's interrogating officers, Law Enforcement's remarks about mandatory life imprisonment versus cooperation amounted to promises of leniency. These remarks went far beyond simple assurances that cooperative efforts would be relayed to prosecuting attorneys. While Law Enforcement was not so explicit as to specify numbers, or to express the exact type of leniency that they intended to bestow, they did repeatedly assure Defendant, in various ways, that clearly intimated Defendant would be better off confessing. The vague nature of these assurances did not make them any less powerful. As the United States Court of Appeal for the Ninth Circuit recognized in *United States v. Tingle*:

> A confession is involuntary whether coerced by physical intimidation or psychological pressure. (citation omitted). Law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.' (citation omitted).

658 F.2d 1332 (9th Cir. 1981).

Lastly, in judging the totality of the circumstances, the Court is directed by precedent to consider Defendant's age, education, and level of intelligence. At first blush, this factor seems to favor the Government. Defendant is a young man who is actually more intelligent than what he appears on tape. In a general sense, because of his criminal history, Defendant should be less vulnerable to mental coercion and trickery than a particularly young or unintelligent suspect. However, given the unique circumstances surrounding the present interrogation, Defendant's criminal history and prospect of life imprisonment actually could render him more susceptible to the promises for leniency that were expressed.

7

*IV. Conclusion*

For the reasons stated, the Defendant, Christopher Pipes, respectfully requests suppression of the statement he made to Law Enforcement they were taken in violation of his Fifth Amendment rights to due process and to remain silent.

    CHRISTOPHER NICHOLAS PIPES

    STOBBS LAW OFFICES

BY:
    /s/John D. Stobbs II
    John D. Stobbs II, No. 43052
    E.D.Mo. Number 40623
    Attorney for Defendant
    307 Henry St. Suite 211
    Alton, Illinois 62002
    Telephone: (618)462-8484
    FAX: (618)462-8585
    Email: jds2@stobbslaw.com

## CERTIFICATE OF SERVICE

      I hereby certify that on October 31, 2019, a copy of the attached *Defendant's Motion to Suppress Statements* was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Ms. Angie Danis
Assistant U.S. Attorney
111 S. 10th Street
St. Louis, Missouri 63102

STOBBS LAW OFFICES

/s/ John D. Stobbs II
Attorney for Defendant
307 Henry St. Suite 211
Alton, Illinois 62002

9